IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| KEVIN A. THOMAS, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 2:11-1344 |
| | ) | |
| NORMAN BARILLA, ESQ., JOHN DICOLA, JR., DOLORES DICOLA, and HOLLY THOMAS, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**Conti, Chief District Judge**

**I.     Introduction**

This matter is before the court upon motions for summary judgment filed by defendants Norman Barilla ("Barilla") (ECF. No. 98), John DiCola, Jr. ("John" or "DiCola") (ECF No. 109), Delores DiCola ("Delores") (ECF No. 120), and Holly Thomas ("Holly") (ECF No. 114). In the underlying action, plaintiff Kevin Thomas ("Kevin" or "plaintiff") contends that the defendants conspired to deprive him of his constitutional rights during the course of state custody proceedings related to his son, CJT. (ECF No. 35.) Invoking 42 U.S.C. § 1983, plaintiff primarily contends that the defendants violated his constitutional rights as secured by the First and Fourteenth Amendments (Counts I and II). (Id.) He also raises a civil conspiracy claim related to the aforementioned violations (Count III) and asserts a state law claim of intentional infliction of emotional distress (Count IV). (Id.) This court has jurisdiction pursuant to 28 U.S.C. § 1331, 1343(a)(3), (4) and 42 U.S.C. § 1983.

## II. Factual Background

Kevin and his ex-wife, Holly, are the divorced parents of a minor child. (Combined Statement of Material Facts ("C.S.F.") (ECF No. 146) ¶ 6.) John and Delores DiCola are Holly's parents. (Id. ¶ 7.) Barilla, a Lawrence County attorney, is a high school classmate and friend of DiCola. (Deposition of Norman Barilla ("Barilla Depo.") (ECF No. 130-2) at 11). Defendant Deborah Shaw ("Shaw"), another Lawrence County attorney, is a former legal partner and employee of Barilla. (C.S.F. (ECF No. 93) ¶ 9.) Judge John Hodge ("Judge Hodge") is a judge on the Lawrence County Court of Common Pleas. (Id. ¶ 8.)

Since 2004, Kevin and Holly have been embroiled in a custody dispute concerning their son, CJT. (Deposition of Holly Thomas ("Holly Depo.") (ECF No. 130-6) at 35.) In broad brush, Kevin alleges in the instant action that DiCola and Barilla supported Judge Hodge in his 2005 judicial election campaign in exchange for Judge Hodge's agreement to administer CJT's custody proceedings in a manner that favored Holly. To this end, Kevin's second amended complaint portrays DiCola as a heavyweight in local politics and a longtime friend and political associate of Judge Hodge. (ECF No. 35 ¶¶ 14, 17.) Kevin asserts that Judge Hodge's reputation had previously been marred by scandal and that he would not have been elected to the bench without the direct support of DiCola. (Id. ¶¶ 26-27.) In return for that support, Kevin contends that Judge Hodge explicitly agreed to help DiCola's daughter, Holly, gain the upper hand in CJT's custody proceedings. (Id. ¶¶ 31-32). Kevin suggests that Barilla, because of his friendship with both Judge Hodge and DiCola, participated in and supported this scheme. (Id. ¶ 35.) Kevin alleges that the defendants met on many occasions to discuss how best to aid Holly in the custody case. (Id. ¶¶ 35, 41.)

Because the facts underlying these accusations are heavily disputed, the court will examine them in depth.

*A. The Relationship Between the Parties*

From 1988 through 2010, DiCola served as an elected township supervisor in Neshannock Township, located in Lawrence County. (Deposition of John DiCola ("DiCola Depo.") (ECF No. 130-5) at 17-18.) From 1982 until 1996, and again in 2004, Judge Hodge served as the Lawrence County solicitor. (Deposition of John Hodge ("Hodge Depo.") (ECF No. 130-3) at 13-14.) Prior to his election to the bench, Judge Hodge and Barilla had legal offices next door to one another on Wilmington Road in Neshannock Township. (C.S.F. (ECF No. 93) ¶ 37.) Over the course of the years that they worked in adjoining buildings, Barilla and Judge Hodge would occasionally meet in Barilla's office to socialize. (Id. ¶ 36.)

According to Kevin, DiCola and Judge Hodge worked together on a handful of occasions while both held public office in Lawrence County. (Deposition of Kevin Thomas ("Kevin Depo.") (ECF No. 130-1) at 15-20.) For example, Kevin testified that DiCola had consulted with Judge Hodge concerning how to create a permanent full-time township position for himself. (Id. at 16-17.) He testified that Judge Hodge later assisted DiCola with a property matter (id. at 19-20), and once gave Holly advice on an employment issue that arose while she was working for UPMC in 1999. (Id. at 20.) With respect to each of these interactions, Kevin stated that he had learned about them directly from DiCola. (Id. at 15, 17-18, 20.)

Kevin testified that a local attorney, Luanne Parkenon ("Parkenon"), approached him at a social gathering in 2011 and informed him that Barilla and Judge Hodge shared a "long-time relationship." (Kevin Depo. (ECF No. 130-1) at 21.) Prior to becoming an attorney, Parkenon

had briefly worked as a legal assistant for Barilla in 1995 and 1996. (Barilla Depo. (ECF No. 130-2) at 42-43; Affidavit of Luanne Parkonen ("Parkenon Aff.") (ECF No. 101-9) ¶ 2.) According to Kevin, Parkenon informed him that Barilla and Judge Hodge used to "regularly" visit in Barilla's law offices and that Barilla had supported Judge Hodge in his judicial election campaign. (Kevin Depo. (ECF No. 130-1) at 22-23, 28.) Kevin testified that Parkonen also implied that John DiCola had "probably" supported Judge Hodge during his election campaign. (Id. at 32.) Kevin recalls Parkenon stating that DiCola also occasionally met with Judge Hodge and Barilla, although she could not provide any specific dates, times, or details with respect to those meetings. (Id. at 27-28.)[1]

For their part, DiCola and Judge Hodge each denied that any of the interactions alleged by Kevin ever took place. (DiCola Depo. (ECF No. 130-5) at 28-29, 31, 44; Hodge Depo. (ECF No. 130-3) at 25-26, 44-45.) During his deposition, DiCola testified that he had never met Judge Hodge prior to the custody proceedings between Keven and Holly. (DiCola Depo. (ECF No. 130-5) at 28-29, 31, 44.) Judge Hodge admitted that he had heard of DiCola because of DiCola's position as a Neshannock Township supervisor, but testified that he has never interacted with him or met him outside of court. (Hodge Depo. (ECF No. 130-3) at 18-19, 25-26, 44-45.) Both DiCola and Judge Hodge denied ever consulting on any legal matters during their public employment or taking any steps to manipulate the assignment of CJT's custody proceeding. (DiCola Depo. (ECF No. 130-5) at 44-46; Hodge Depo. (ECF No. 130-3) at 46.)

Barilla acknowledged his long relationship with DiCola and admitted that he knew Judge Hodge from their time working in adjacent buildings in Neshannock. (Barilla Depo. (ECF No.

---

[1] Kevin's testimony about what Parkenon told him is not admissible because it is hearsay. See, e.g., Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.").

4

130-2) at 8-13.) However, he denied ever taking any action to use his friendship with DiCola or his acquaintance with Judge Hodge to influence CJT's custody proceedings. (Id. at 8-9, 65.)

In an affidavit filed on behalf of the defendants, Parkenon recalled mentioning to Kevin that Judge Hodge and Barilla used to visit occasionally in Barilla's office, but did not remember stating that either of them had any connection to DiCola. (Parkenon Aff. (ECF No. 101-9) ¶¶ 3-5.) She explained that she had not worked for Barilla for over ten years prior to her conversation with Kevin and, consequently, would have no personal knowledge about whether DiCola, Barilla and Judge Hodge maintained a friendship or ever met with one another. (Id. ¶¶ 4-5.)

*B. The Custody Proceedings*

In 2004, Kevin and Holly commenced custody and child support hearings in the Allegheny County Court of Common Pleas. (Holly Depo. (ECF No. 130-6) at 35.) In June 2004, Holly moved to Neshannock Township, in Lawrence County. (Id. at 35.) On August 21, 2006, Holly's attorney petitioned to have the proceeding transferred to Lawrence County where it was assigned to Judge Hodge. (C.S.F. (ECF No. 93) ¶ 4.) On September 25, 2009, Judge Hodge appointed Shaw, Barilla's legal partner, to serve as CJT's Guardian Ad Litem ("GAL"). (Id. ¶ 10.)

In June 2011, John and Delores DiCola began to investigate the possibility of purchasing a local bakery, possibly in conjunction with Holly. (Id. ¶ 25). They requested Barilla's assistance in negotiating the potential purchase. (Id. ¶ 25.) Shortly thereafter, Kevin, through counsel, expressed his discomfort with Shaw serving as GAL given that her legal partner, Barilla, might represent Holly and her parents in the bakery acquisition. (Id. ¶¶ 25-27.) Shaw

responded by filing a voluntary petition to withdraw as GAL. (Id. ¶ 28.) Judge Hodge signed an order granting that petition on July 1, 2011. (Id. ¶ 29.)

Throughout the custody proceedings, Kevin became increasingly uncomfortable with what he perceived as "disastrous behavior" on the part of Judge Hodge in the administration of the case. (Kevin Depo. (ECF No. 130-1) at 43.) In particular, Kevin criticized Judge Hodge's decision to appoint Shaw as GAL given her connection to the DiCola's by way of Barilla. (Id. at 50.) Kevin also contends that Holly taunted him at one point by asking him, "How do you like my new Judge?" (Id. at 43.) Eventually, Kevin became convinced that the defendants had arranged to have CJT's custody proceedings transferred from Allegheny County to Lawrence County so that they could be placed under Judge Hodge's control. Based upon this belief, Kevin initiated the instant lawsuit against Judge Hodge, Shaw, Barilla, Holly, and John and Delores DiCola. (ECF No. 1.) The following day, Judge Hodge recused himself from the underlying custody proceedings. (C.S.F. (ECF No. 93) ¶ 8.)

### III. Procedural History

Kevin commenced the instant lawsuit on October 24, 2011. (ECF No. 1.) On December 6, 2011, Judge Hodge moved to dismiss on the grounds of Eleventh Amendment and judicial immunity. (ECF. No. 5.) The remaining defendants filed a motion to dismiss for failure to state a claim on December 12, 2011.

On May 29, 2012, the court held a hearing and dismissed Judge Hodge from this action with prejudice on the basis of judicial immunity. (ECF No. 78 at 2.) The court dismissed Kevin's claims against the remaining defendants without prejudice and instructed Kevin he may file an amended complaint. (Id.)

6

Kevin's first amended complaint was filed on June 18, 2012. (ECF. No. 27.) A second amended complaint was filed on July 30, 2012. (ECF. No. 35.) Each of the remaining defendants again moved to dismiss. (ECF. No. 36.) On November 13, 2012, the court granted Shaw's motion to dismiss, but denied the motion to dismiss with respect to the other remaining defendants. (ECF. No. 76.)

Following a period of discovery, Barilla filed a motion for summary judgment on January 13, 2014. (ECF. No. 98.) On January 20, 2014, John, Holly, and Delores each filed separate but identical motions for summary judgment. (ECF. Nos. 109, 114, 120.) Kevin responded to each motion on March 24, 2014. (ECF. Nos. 131, 135.) The defendants filed individual reply briefs on April 2, 2014. (ECF. Nos. 136-139.) Each motion is now fully briefed and ripe for review.

## IV.  Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could

render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. Celotex Corp., 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Id. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

**IV. Discussion**

To prevail on a claim under 42 U.S.C. § 1983 a plaintiff must demonstrate: (1) that he was deprived of a right, privilege or immunity secured by the Constitution or the laws of the United States, and (2) that the conduct complained of was committed by a person acting under color of state law. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1264 (3d Cir. 1994). An individual may be considered a state actor when: "(1) he is a state official, (2) 'he has acted together with or has obtained significant aid from state officials,' or (3) his conduct is, by its nature, chargeable to the state." Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 277 (3d Cir. 1999) (quoting Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982)).

A private individual can be liable under § 1983, despite not being a state actor, if he or she engages in a conspiracy with a state actor to deprive another person of his or her constitutional rights. See Dennis v. Sparks, 449 U.S. 24, 27-28 (1980) ("Private persons, jointly

engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions."). This is true even where the only state actor involved in the conspiracy is entitled to immunity. Id. at 28. Thus, "[p]rivate parties who corruptly conspire with a judge . . . are . . . acting under color of state law within the meaning of § 1983 . . . ." Id. at 29.

In the instant case, there is no dispute that the remaining defendants are private individuals rather than state actors. Consequently, in order for Kevin to prevail on any of his federal claims, he must establish that one or more of the defendants conspired with Judge Hodge to deprive him of a federally protected right.

The existence of a civil conspiracy under § 1983 is established if the plaintiff demonstrates that "two or more persons [combined] to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." Ammlung v. City of Chester, 494 F.2d 811, 814 (3d Cir. 1974). Specifically, the plaintiff must establish a "combination, agreement, or understanding among all or between any of the defendants [or coconspirators] to plot, plan, or conspire to carry out the alleged chain of events." Hammond v. Creative Fin-Planning Org., Inc., 800 F. Supp. 1244, 1249 (E.D. Pa. 1992); see Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989) (allegations of conspiracy must address "the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose"). The "*sine qua non*" of a conspiracy is an agreement to deprive the plaintiff of a federally protected right. Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997); see Startzell v. City of Phila., 533 F.3d 183, 205 (3d Cir. 2008) ("To constitute a conspiracy, there must be a meeting of the minds."); Kerr v. Lyford, 171 F.3d 330, 340 (5th Cir. 1999) (requiring "actions taken in concert by the defendants with the specific intent to violate" a protected right).

9

Apropos to the instant case, the United States Supreme Court and the Court of Appeals for the Third Circuit have each explicitly addressed the "requirements for cases in which a plaintiff alleges conspiracy with a judge." Mikhail v. Kahn, 991 F.Supp.2d 596, 645 (E.D. Pa. 2014). In Dennis, the Supreme Court observed that "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge." Dennis, 449 U.S. at 28. The plaintiff must establish the existence of "an agreement between the state court judges and [d]efendants to rule in favor of [defendants]." Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 178 (3d Cir. 2010) (citing Dennis, 449 U.S. at 28). Bare allegations that a conspiracy must have existed simply because of "concerted action of a kind not likely to occur in the absence of an agreement" are insufficient. Great W. Mining, 615 F.3d at 178. "'A conspiracy cannot be found from allegations of judicial error, ex parte communications (the manner of occurrence and substance of which are not alleged) or adverse rulings absent specific facts demonstrating an agreement to commit the alleged improper actions.'" Capogrosso v. Supreme Court of N.J., 588 F.3d 180, 185 (3d Cir. 2009) (quoting Crabtree v. Muchmore, 904 F.2d 1475, 1481 (10th Cir. 1990)). A plaintiff cannot merely rely on "his own suspicion and speculation" to meet this evidentiary burden. Young v. Kann, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991).

Applying these principles to the instant case, the court concludes that summary judgment is appropriate because Kevin failed to produce any evidence that the defendants reached an agreement with Judge Hodge to deprive him of a fair custody proceeding.[2] In attempting to create a triable issue of fact on this issue, Kevin relies entirely on his own deposition testimony,

---

[2] As an aside, the court notes that there are clearly disputed issues of fact concerning the details of the general relationship between the alleged co-conspirators. Although Kevin alleges that Judge Hodge, DiCola and Barilla shared broad political and personal connections, the defendants denied those allegations. This dispute, if deemed material, would need to be resolved by a jury. However, as discussed below, this dispute is not material because Kevin did not produce any evidence suggesting the existence of an agreement or a meeting of the minds.

the statements allegedly made by Parkenon, and the comment by Holly concerning "her new Judge." A scrutinizing examination of Kevin's testimony, however, reveals nothing more than vague and unsupported allegations. For example, when asked to describe the general basis for his belief that a conspiracy existed, Kevin primarily relied on his own observations concerning the outcome of the proceedings:

> Q: What information do you have that Mr. DiCola promised to help Judge Hodge in his election efforts if Judge Hodge promised to help Holly in her case?
>
> A: Twofold. We had afterwards statements made by Holly asking how I liked her new judge, and we have the disastrous behavior of the judge in the case.
>
> Q: The what behavior?
>
> A: Disastrous behavior.
>
> Q: Disastrous?
>
> A: Yes, sir.
>
> Q: What do you mean by that?
>
> A: As we moved through the case, from outset on down it became apparent the judge was disinterested in the case itself but, rather, in serving the interests of his long-time friend, John DiCola, and his long-time friend [sic] daughter, Holly.
>
> Q: And that's based on your observations?
>
> A: Yes, sir.

(Kevin Depo. (ECF No. 130-1) at 43.) When pressed to elaborate, Kevin stated only that it was common for DiCola to "talk about his power in the community and his ability to get things done." (Id. at 44-46.) He, however, could not supply any factual detail concerning what factors made it "apparent" that Judge Hodge's "disastrous" rulings stemmed from loyalty to DiCola. As noted above, a plaintiff cannot establish that a defendant conspired with a judge simply through

11

"allegations of judicial error" or by opining that the outcome was "not likely to occur in the absence of an agreement." Capogrosso, 588 F.3d at 185; see Great W. Mining, 615 F.3d at 178.

Similarly, although Kevin's conspiracy claim derives in large measure from his belief that DiCola assisted Judge Hodge's bid for election, Kevin could not supply any support for this proposition, stating only that it was "standard routine" for DiCola to exchange "favors for favors" with political allies.[3] (Kevin Depo. (ECF No. 130-1) at 44-46.) Kevin cited to his conversation with Parkenon, who allegedly indicated that DiCola had "probably" supported Judge Hodge. (Id. at 32.) Kevin, however, conceded that Parkenon's statements were based on "common knowledge throughout the community" rather than personal knowledge, as required by Rule 56. (Id. at 32.) See Fed. R. Civ. Pro. 56(c)(4) (evidence used to "support or oppose" a summary judgment motion must be based on "personal knowledge"). Moreover, the statements attributed to Parkenon are also hearsay and cannot be relied upon to create a triable issue of material fact. Smith, 589 F.3d at 693; see White v. Brown, 408 F. App'x 595, 599 (3d Cir. 2010) (affirming the district court's grant of summary judgment in favor of defendants on a § 1983 conspiracy claim where the only evidence of an agreement to deprive the plaintiff of a constitutional right was in the form of inadmissible hearsay).

Kevin admitted that he had no personal knowledge of any out-of-court meetings or conversations between any of the defendants and Judge Hodge in furtherance of the alleged conspiracy:

> Q: Now, you write in here in paragraph 35 that, quote, "They met on numerous occasions to discuss how to further the

---

[3] Curiously, Kevin testified at one point that DiCola's opinion of Judge Hodge had "soured acutely and fairly dramatically" at some point prior to Judge Hodge's election campaign due to accusations of "shady deals" and "alcoholism." (Kevin Depo. (ECF No. 130-1) at 35-36.) When asked to explain why DiCola would support a person for judge of whom he held such a low opinion, Kevin offered only that "[DiCola's] opinion of people tends to blow with the wind pretty quickly." (Id.)

|      |                                                                                                                                                                       |
| ---- | --------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|      | agreement to aid Defendant Holly Thomas with Judge Hodge's assistance." What meetings are you aware of?                                                               |
| A:   | Individual meetings and dates --                                                                                                                                      |
| Q:   | Yes.                                                                                                                                                                  |
| A:   | -- I don't have.                                                                                                                                                      |
| Q:   | What is your basis for making that allegation?                                                                                                                        |
| A:   | A simple coordination of the case.                                                                                                                                    |
| Q:   | A simple what?                                                                                                                                                        |
| A:   | A simple coordination of this case to move forward.                                                                                                                   |
|      | * * * * * * *                                                                                                                                                         |
| Q:   | Turn to paragraph 41, please. Again, you speak of periodic meetings with the DiColas, Holly, and input from Judge Hodge. Do you have any information as to where or when these meetings took place? |
| A:   | I do not.                                                                                                                                                             |
| Q:   | Again, you simple believe that they had to have occurred because of the coordination of the case.                                                                     |
| A:   | That would be accurate.                                                                                                                                               |

(Id. at 49-52.) When asked to explain what he meant by "coordination," Kevin again pointed to the outcome of the proceedings, particularly Judge Hodge's *sua sponte* appointment of Shaw as GAL and Shaw's performance in that position. (Id. at 50.)

As noted above, when a civil rights conspiracy is alleged, "'there must be some specific facts . . . which tend to show a meeting of the minds and some type of concerted activity. A plaintiff cannot rely on subjective suspicions and unsupported speculation.'" Savage v. Judge, 644 F.Supp.2d 550, 561 (E.D. Pa. 2009) (quoting Wilkins v. Bittenbender, No. 04-2397, 2006 WL 860140, at * 6 (M.D. Pa. Mar. 31, 2006)). Contrary to this standard, Kevin's testimony

13

consists primarily of vague and conclusory allegations that a conspiracy must have existed simply because of how poorly he believes that Judge Hodge handled his case. Kevin failed to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)).

This failure is fatal to Kevin's federal claims. The § 1983 claims asserted in Counts I-III each depend upon the existence of a conspiracy between the defendants and the lone state actor involved in this action, Judge Hodge. None can survive in this case due to the absence of any evidence suggesting the existence of an agreement with Judge Hodge to manipulate the outcome of CJT's custody proceedings.

Because summary judgment must be granted in favor of the defendants with respect to the federal claims, the court need not address the state law claim for intentional infliction of emotional distress. A district court may decline to exercise supplemental jurisdiction where the federal claims are no longer viable. 28 U.S.C. § 1367(c)(3); Trinity Indus., Inc. v. Chicago Bridge & Iron Co., 735 F.3d 131, 135 (3d Cir. 2013). The decision with respect to whether to exercise supplemental jurisdiction under these circumstances is within the district court's discretion, and factors such as when the federal claims are removed from the case, and under what circumstances, are relevant. 28 U.S.C. § 1367(c)(3), cmt. (1988) (Discretionary Rejection of Supplemental Jurisdiction); Growth Horizons, Inc. v. Delaware Cnty., Pa., 983 F.2d 1277, 1284-85 (3d Cir. 1993). The Court of Appeals for the Third Circuit has held that, where all federal claims are dismissed before trial, "the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties

provide an affirmative justification for doing so." Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (citations omitted).

**V.     Conclusion**

Because plaintiff failed to produce evidence demonstrating that a genuine issue of material fact exists concerning the existence of a conspiracy between the defendants and Judge Hodge, the defendants' motions for summary judgment will be granted and judgment will be entered in favor of the defendants with respect to the federal claims and the state law claim will be dismissed without prejudice.[4]  (ECF Nos. 98, 109, 114, 120.)  An appropriate order follows.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge

Dated:  September 22, 2014

---

[4] John and Delores Dicola and Holly each filed motions for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. (ECF Nos. 140, 142, 144.)  Rule 11 sanctions are "appropriate only when the filing of the complaint constitutes abusive litigation or misuse of the court's process." Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988).  "If there is an arguable basis, no matter how tenuous, Rule 11 may not be invoked even when a attorney is unable to produce adequate evidence after discovery to withstand a motion for summary judgment." Id. (internal citation omitted).  In the instant case, although plaintiff's claims did not ultimately prevail, they were  not frivolous or abusive.  As such, there is no basis for an award of sanctions pursuant to Rule 11.  The Rule 11 motions will be denied.